## COMMONWEALTH *v.* EDWARD PARKER.

[Charged with selling lottery tickets.]

AFTER the several hearings in this case, and the arguments of counsel, the RECORDER said he would take time, to examine the questions involved in the case, and give his decision at a future day. On the 14th of June, 1844, the following opinion was delivered, and the defendant discharged.

This complaint against Edward Parker is made under the act of the general assembly of the commonwealth, passed the first day of March, A. D. 1833, and the 2d section of the said act, which is as follows: "From and after the day aforesaid, any person or persons who shall sell or expose to sale, or cause to be sold or exposed to sale, or shall keep on hand for the purpose of sale, or shall advertise or cause to be advertised for sale, or shall aid or assist, or be in anywise concerned in the sale or exposure to sale of any lottery ticket or tickets, or any share or part of any lottery ticket in any lottery or device in the nature of a lottery within this commonwealth or elsewhere, and any person or persons who shall advertise or cause to be advertised the drawing of any scheme in any lottery, or be in any way concerned in the managing, conducting, carrying on, or drawing of any lottery or device in the nature of a lottery, and shall be convicted thereof in any court of competent jurisdiction, shall for each and every such offence for-

feit and pay a sum not less than one hundred dollars, and not exceeding ten thousand dollars, or be sentenced to undergo an imprisonment not exceeding six months, at the discretion of the court."

Under this section, there are two specific misdemeanors, or certain acts or classes of acts, by which these crimes may be effected, contrary to the statute. The first of these, is the sale of lottery tickets, or parts or shares of tickets; and the criminality consists in the selling, exposing to sale, or causing to be sold or exposed for sale, or keeping on hand for the purpose of sale, or advertising or causing to be advertised for sale, or being in anywise concerned in the sale of any lottery ticket, or any part or share of any lottery ticket or tickets. The whole of this class of acts relates to the sale, first, of lottery tickets, or share or part of any ticket or tickets. The second offence is the drawing of any lottery; and the criminality is in the advertising, &c., or being concerned in the managing, conducting, carrying on, or drawing of any lottery, &c.; and the punishment "for each and every such offence," is fine or imprisonment, at the discretion of the court.

The intention of the legislature was to prevent by this act, the sale of lottery tickets, or any part or share of any lottery tickets, or device in the nature of a lottery in this state; it matters not whether the lottery was set up in Pennsylvania "or elsewhere." It appears to me, that being engaged in the commission of any of the offences under the second class as above described, if the lottery be "elsewhere," and legally authorized there, renders it questionable at least, if our courts have jurisdiction. That the advertising of the drawing, or being

11*

concerned in the drawing of a lottery in a sister state, legally authorized by its laws, to effect which may require the overt acts to be done in such state, though the parties reside in Pennsylvania, is punishable under this statute, is a matter of doubt. To contend, that to print and publish in a public newspaper here, or otherwise notify any citizen who may desire to buy lottery tickets, that he may go to Delaware where the law allows such purchase, and where all the acts necessary thereto are legalized and lawful,—or, to reside in Pennsylvania, and be concerned in the drawing, managing or conducting a lottery lawfully established, where all the matters and things incident to such managing and conducting and drawing, take place in such state, by virtue of its laws and authority; is punishable in this state, under this act, involves an uncertainty. But whether this be questionable or not, it does seem to me apparent on the face of this act, that the legislature had reference only to the advertising, or drawing, or managing, or conducting a lottery which was within the jurisdiction of the state. In regard to the sale of tickets, the legislature has been precise in expressing its intention, for it speaks of tickets in "a lottery within this commonwealth or elsewhere;" and it is equally true, that there is a want of a similar distinctness in relation to the other class of crimes.

There is another view of the subject, in connexion with the second branch or design of the act, which strengthens that already expressed. The title of the act is "an act for the entire abolition of lotteries." The preamble refers exclusively to lotteries within the commonwealth. The first section of the act declares all and every lottery to be "unauthorized and unlawful;"

consequently, the act only refers to lotteries within the commonwealth, for it is not, nor cannot be contended, that our legislature can declare a lottery in Delaware unlawful.

What then is unlawful under this act in Pennsylvania? 1. The sale of lottery tickets, or any ticket in any device of the nature of a lottery here or elsewhere; 2. The expose of any such to sale; 3. The causing of any such to be sold or exposed to sale; 4. The keeping on hand any such for sale; 5. The advertising or causing to be advertised any such for sale; 6. The aiding, assisting, or being in anywise concerned in the sale or exposure of any such for sale.    It is the same in relation to any share or part of any such ticket or tickets.    Either, or all of these acts are unlawful, and are punishable individually with fine or imprisonment.

I shall not speak of the other offences contemplated by this act, and coming under the second head of the first subdivision, as there is no evidence to sustain either in this case, and there is therefore no necessity, of expressing any opinion as to the part of the act alluded to.

The commonwealth contends that the defendant is proved guilty of selling, keeping on hand for the purpose of sale, being concerned in the sale, and procuring others to sell lottery tickets, contrary to this act.

The testimony on which these charges rest is, that one John Miller bought lottery tickets of Parker, and that Samuel Thompson saw others buy tickets of Parker, and Robert Harmer and John Fagan saw tickets in Parker's store, and that John Miller also saw what is called a scheme, in Parker's office, of the Delaware lottery.  This is very clear and positive testimony

against Parker; but I am of opinion, in order to make it conclusive, it should be followed up by either the ticket or tickets, or copies legally identified should be produced, or such a description as would be admissible in law as evidence.

Under this section, which refers to "ticket or tickets, or any share or part of any lottery ticket," the testimony now under consideration is too vague and uncertain; for we have no evidence to show if what was exposed or sold, &c., was either a ticket or tickets, or any share or part of any lottery ticket; indeed, it proves too much to constitute an indictable offence. The supreme court in Commonwealth *v.* Gallespie et al., 7 Serg. & Rawle, page 469, have held, that a court in an indictment charging that the defendant sold a lottery ticket and tickets in a lottery, &c., is bad for its generality. It should specify the name of the lottery, and the number of tickets sold. Therefore, it follows, that a charge of selling or dealing in, or exposing for sale and having on hand for the purpose of sale, lottery ticket or tickets, is too general or vague to warrant a binding over, in the absence of the proof already referred to. And again, there is no evidence offered to describe the character of these tickets, as to whether they were tickets, "or any part or share of any ticket," neither is the name, style, or title of the lottery given in evidence. I consider this is a fatal defect in the chain of testimony. The commonwealth's witnesses have proved the sale of tickets, which puts them in the possession of the tickets thus sold; and it is with the commonwealth to produce them on this hearing. In relation to what are called lottery tickets, and are sworn to have been seen in Parker's

premises and possession, there is no proof of any kind, describing either the character of the tickets, whether they were whole tickets, or any share or part of any ticket, or the number of such tickets, or the name and style of the lottery, or indeed, if it was a lottery at all. For if the pieces of paper thus exposed for sale, or on hand for the purpose of sale, were not the lawful tickets of a lawful lottery, made so by the legislature of the state in which such lottery purported to be, the exposure to sale, or selling, would not be unlawful here, under this act, for they would not be lottery tickets.

There is a strong analogy between the provisions of this act, and the proceedings under it, and the act relating to counterfeit bank notes. In order to perfect a charge of passing a counterfeit bank note, the note must be produced, that its baseness may appear by the best evidence, the note itself. So it is if the charge be for being concerned in the passing of a counterfeit note; and it would likewise require the production of such a note, if a person should be charged with having on hand for the purpose of passing counterfeit notes. It is a misdemeanor to have on hand counterfeit or uncurrent bank notes, for the purpose of passing them as genuine or par currency. For is a man to set up a shop for the circulation of base money, by exposing it either for sale or exchange as good money, and not be within the reach of the law? Certainly not. By what means then is the character of this species of money to be known, if it be not produced to speak for itself? The denomination of the note, the name of the bank, must be produced, and the fact, if the bank be a bank incorporated by law as an institution having the power by law to

issue such bills. All this must be proven, either by the production of the bills themselves, or such a description as would authorize a competent witness to decide upon their character. And again, if on a certain day, certain bank or promissory notes were feloniously taken and carried away, and after diligent search the owner should have good reason to believe, that the stolen property of any part thereof was in the possession of another, and a process should be obtained for the arrest of the suspected person, what would be the legal course of inquiry, on a hearing? It would be necessary to prove the larceny, then the nature or character of the property stolen, and then by description, the character of the property in the possession of the prisoner, setting out with distinctness the property either seen or known to be in his possession. If the party thus charged, had previously to the suspicion fastening on him, exposed, or had on hand property, similar to that so stolen, and the possession of this property thereby necessarily in him, does it therefore follow that he should produce that property, to show his innocence, if the commonwealth could only produce evidence to show that the property in his possession was similar, without any attempt at description, to that stolen? If not, then the proposition of the commonwealth in this case, that tickets on hand, or exposed for sale, fixes the possession of such property in the prisoner, and he is bound to produce the same, in the absence of any identification or description, upon which their character or illegality is based, is groundless.

Like reasoning is eminently analogous to the case before me, and I can but repeat, that the production of the ticket or tickets or an adequate description of them,

is an essential ingredient to make out this case, in either of its faces, as presented under the statute.

Much as the dealing in lottery tickets is to be regretted as both unlawful and immoral, and calculated to do great injury both to private and public morals,—destroy the peace and happiness of families,—reduce the affluent to poverty, and not unfrequently bring the respectable citizen down, step by step to the grade of the convict, all of which effects have by this cause been produced; yet the law must be lawfully administered by its sworn officers; and while it seeks to punish acts which it declares to be unlawful, the accomplishment of the end will not justify the means. The citizen has a right to be protected, however guilty, against unlawfully administered punishment.

There is a mode by which Parker can be made liable for his acts, even though he should escape at this time, for no citizen can act in violation of the law, and be without its reach.

These views are not new with me. This is not the first case of the kind in which I have been required to act; and if the commonwealth thinks the present case as it is now made out, is sufficiently established under the law, and that I have erred in my views, which I have long entertained and have but repeated here; it can invoke the power of another of its officers who may think differently from me, and thus test the points involved in a tribunal, the decision of which will be binding on the magistracy.

*St. George T. Campbell, esq.*, for commonwealth.
*Goodman, esq.*, for defendant.